Perkins v. Moorestown and Camden Turnpike Co.

## NATHAN E. PERKINS

### *v.*

## MOORESTOWN AND CAMDEN TURNPIKE COMPANY.

1. The title of the owner of lands abutting a turnpike road constructed over a public highway runs to the middle of the road, and the construction of a toll-gatekeeper's house within the lines of the highway on such owner's half, without his consent, is the imposition of an additional servitude which will be restrained.

2. An equitable estoppel is not raised in case of such an erection unless it appears that the landowner has done some act or made some representation, or, by his silence, assumed a position as to his rights inconsistent with his present claim, and that the company, misled as to their respective rights by such conduct of the owner, has expended money on the work, so that it would be a fraud on it if he is permitted to maintain his legal rights; nor were both parties have equal opportunities of knowledge and both act in ignorance of the true state of the case; nor where the owner does not know that the land belongs to him and not to the company.

3. An injunction will not issue to restrain the maintenance of a turnpike gate over a highway, even if unauthorized by law, unless it appears that the complainant suffers therefrom some special injury not sustained by the public.

On bill, answer and proofs taken in open court.

*Mr. Thomas E. French,* for the complainant.

*Mr. Israel Roberts,* for the defendant.

GREEN, V. C.

This bill was filed August 27th, 1890, to restrain the erection of a dwelling and a toll-gate, within the lines of the turnpike of the defendant, in front of the lands of the complainant, and from putting any person in possession or charge of the said dwelling.

On filing the bill, an order to show cause why an injunction should not issue, returnable September 8th, A. D. 1890, was made, with a restraining order in the meanwhile.

On the return, the defendants came in with their answer, setting up acquiescence, by the complainant, in the acts complained of, and thereupon the order to show cause was discharged.

The case subsequently came to final hearing, and testimony was taken in open court.

The defendant was incorporated by an act of the legislature (*P. L. of 1849 p. 145*), with power of constructing a turnpike. Section 11 provides—

" That it shall be lawful for such company to construct and make a turnpike road from the village of Moorestown, in the county of Burlington, to the truss bridge over Cooper's creek, in the county of Camden, which turnpike road shall be constructed and made on and along the public highway leading from said village to said bridge."

The company, under this authority, occupied the former high-way referred to in this section.

The fourteenth section authorizes the company, when it shall have constructed its turnpike road, to erect gates or turnpikes across the said road, not exceeding three in number, and to demand and receive toll for traveling each mile at certain rates therein specified.

It is alleged that prior to the acts complained of, the company had constructed and maintained at least three gates or turnpikes, for the collection of toll upon the road so authorized.

The complainant is the owner of a farm or tract of land abutting upon the highway which the defendant corporation was empowered by the act of the legislature to take. The complainant, the owner of lands adjoining the public highway, was the owner of the fee to the middle of the road. *Salter* v. *Jonas, 10 Vr. 469; Pennsylvania R. R. Co.* v. *Ayres, 21 Vr. 660; Ayres* v. *Pennsylvania R. R. Co., 23 Vr. 405.* It was competent for the legislature to authorize the turnpike company to appropriate the public highway. *Wright* v. *Carter, 3 Dutch. 76.*

The grant by the legislature to the defendant did not affect the title of the complainant, but only conferred upon the company the right, formerly enjoyed by the public, of passage, with the right to take toll from persons using the same.

It is not disputed that the defendants in July, 1890, commenced the erection of the toll-gate and a dwelling-house for the toll-gatherer, within the lines of the turnpike, on the complainant's side of the road, and on lands the fee of which belonged to him.

The complainant rests his claim for relief and opposition to the action of the defendant on the grounds—

*First.* That the only right which the defendants had over the lands of the complainant, within the lines of the turnpike road, was to construct and maintain their turnpike road, and to keep the same for the use of the public; that the erection of a dwelling-house thereon was imposing upon it a new servitude, which they were not authorized to create.

*Second.* That the company was only authorized by its charter to erect and maintain the three gates or turnpikes, which it had already established; that its power in that regard was exhausted, and its attempted establishment of the new one in front of his property was *ultra vires.*

In the case of *Wright* v. *Carter, supra,* the supreme court, in addition to the point above referred to, also decided that the right to erect a house for a toll-keeper was necessarily incidental to the power to erect and maintain gates or turnpikes for the collection of toll. On the case going to the court of errors and appeals, it was reversed as to this ground.

' The chief-justice in *State* v. *Laverack, 5 Vr. 201* (at *p. 208*), says, he had always understood "that the view of the supreme court, touching the legislative right to convert the public highway into a turnpike was concurred in by the higher court, and that the point of dissent was with regard to the privilege which had been sanctioned of putting the toll-house on the property of the land-owner."

Chancellor Zabriskie in *Freeholders* v. *Red Bank, 3 C. E. Gr. 91* (at *p. 94*), also gives this as his understanding of the action of the court of errors and appeals. See, also, *Wuesthoff* v. *Seymour, 7 C. E. Gr. 66; Halsey* v. *Rapid Transit Street R. R. Co., 2 Dick. Ch. Rep. 380* (at *p. 394*).

The authorities in this state make it clear that the defendants had no absolute right under their charter to erect or maintain a dwelling-house for a toll-gatherer, or any one else, upon the lands belonging in fee to the owner of the adjoining property.

It is claimed, however, that the complainant is estopped from now objecting to the erection of this building.

· The complainant testifies that he was away from home part of the month of July, 1890, and that on his return, on the 17th of July, his tenant told him that the turnpike company was at work on this building; that he went there and found that they had already walled up the cellar; that he saw Mr. Mason, a director of the defendants, asked him why he did not go further down with his building, and told him that he did not want it there;

Mr. Mason wanted some dirt to raise the turnpike, and that he (complainant) told him he might have all the dirt he wanted, but he did not want to be prejudiced in his right by the fact that he had given them that permission; that at the time he went there they were already digging a well and were at work at the cellar; that the dirt they wanted was to raise the grade of the road—they did not say where they wanted to use the dirt; he told them where to take it from, but they did not get it from the place he indicated.

James Firth testifies that the building was commenced when Mr. Perkins was not at home, and that the cellar was dug and walled up before he got back.

John Mason testifies that they laid out the cellar on July 14th—on Monday; dug the cellar, and the masons came on Wednesday, the 16th, and the well was commenced on the 16th. He says that Mr. Perkins was there on the 16th; the masons were then about to put up the wall; that he asked why they had not gone further down, but said he did not know that it made any difference; he did say he would rather have had it further down, but afterwards that it did not make any difference to him where it was; that he did not object to their going on with the work; as to the dirt, that he said he (Mason) could have all the dirt he wanted at ten cents a load. Mason said he wanted it for re-grading the road and filling in around the house; that complainant did not at that time speak of prejudicing his case, but he did say so when he (Mason) went to pay for the dirt.

This building is a two-story building, with six rooms—a frame house, which can be moved.

Mr. Emmons Roberts, president of the defendant, testifies to a conversation with the complainant after the cellar was dug and walled up, and that the well was dug and walled up, on July 19th. He says that the complainant did not express a dissent—only that he would rather have had it further down—and that the first positive objection that he got was a letter from Mr. French on August 15th.

Mr. Cranmer says that he saw Perkins there on the 16th, the day they commenced, and that the complainant said that he would

rather have had it built over the branch a few hundred yards below, but did not think it would make much difference.    Afterwards he says that this was on the second day, after they had got down some eight or nine feet.    Cranmer is the well-digger.

I am satisfied from the evidence that the defendants, without consultation with the complainant, had determined to erect this building and gate at this point, and, without even asking his consent, commenced the construction ; that he was away from home at the time, and that when he first saw the work the cellar was dug and walled up, and the well was dug and partially walled up ; that the action of the defendants in spending their money in the erection of this building, or of the toll-gate, was not induced by any act or words of the complainant ; that when the matter was brought to his attention he objected.    It may have been that it was done mildly, but still there is nothing in the testimony which can be tortured into a conclusion that he gave his consent, or did anything inconsistent with his present claim, or that the company, in consequence of anything that the complainant did or said, either with reference to the location of the building, or with reference to the dirt, which he sold to them for the purpose of leveling up the road, induced them to expend the money which they claim they have laid out.

As to the sale of dirt, it will be found, by investigation of the charter of this company, that they had the right to take and condemn dirt and gravel and sand, which they might need for the construction or repair of their road, and they would therefore have had a right to have taken this dirt *in invitum* if he had not been willing to have made a sale.    He did so, expressly stating that he did not wish to prejudice his rights by such act.    He claims that he made this remark at the time he gave consent to take the dirt, and Mr. Mason, while admitting the main fact, places it at the time when he paid for it.    There is nothing in the case, in my judgment, that will raise an estoppel against the complainant from any conduct of his with reference to this building, or selling the dirt to the defendant.

The case lacks the necessary elements that the complainant has done some act or made some representation, or, by his

silence, negatively assumed a position as to his rights, inconsistent with his present claim, and that the defendants, misled as to their respective rights by such conduct of the complainant, have expended money on the work complained of, so that it would be a fraud on it if he is now permitted to maintain his legal rights. *Den* v. *Baldwin, 1 Zab. 403.* It is urged he acquiesced to the extent of inducing action by the defendants. No different rule applies as to estoppel from silence, and from active representation, so far as relates to the necessity of showing the above-mentioned elements, unless it be that clearer proof of the effect of non-action is required, for misrepresentation, if believed, necessarily misleads, while silence may, or may not, influence subsequent action. The defendants cannot claim to have done what they did in consequence of complainant remaining silent when he should have spoken. They commenced without regard to him. On his return home he found the work already commenced and being vigorously prosecuted; he dissented from the act at once.

It is true that he did not take active measures to prevent the further prosecution of the work until the filing of this bill, which was on the 15th of August, but there is nothing to indicate that his delay had any influence on their action.

A consideration of the case impresses me with the belief that both of these parties acted in ignorance of their own rights and those of the other party. I do not question that the defendants assumed that they had a perfect right, under their charter, to do exactly what they have done, and there is nothing to show that the complainant knew, or had reason to believe, that the acts of the defendants were an infringement upon his rights of property in the fee, which they were unauthorized to make.

The objection which he urged seems to have been directed to the location of the building rather than to the fact that they had, without authority, attempted to put up a building on his land.

In *Mutual Life* v. *Norris, 4 Stew. Eq. 583* (at *p. 585*), Chancellor Runyon says: "Where both parties have equal opportunities of knowledge, and they both act in ignorance of the real state of the case, and the complainant's act, which, he

says, was induced by the defendant, appears to be rather the result of his own will or judgment than the consequence of the defendant's act or representation, there can be no estoppel."

Lord Cranworth, in *Ramsden* v. *Dyson*, *L. R. (1 E. & I. App.) 129*, (at *p. 141*), says: "To raise such an equity two things are required—*first*, that the person expending the money supposes himself to be building on his own land; and, *secondly*, that the real owner, at the time of the expenditure, knows that the land belongs to him and not to the person expending the money in the belief that he is the owner."

The second branch of the canon thus announced is certainly wanting in this case. Mr. Perkins, even if he can be said to have encouraged the expenditure by his silence, is not shown to have known that the property was exclusively his own, and that the company had no right to do what they were doing.

This was a turnpike company, and it is very probable that a gentleman in his position would assume that an incorporated turnpike company had the right to erect a toll-gate along the line of its road, and it would be very pardonable in him to assume that such right carried with it the right to build a house for the toll-gatherer, as eminent jurists have entertained such an opinion.

It is urged that the conduct of the complainant amounted to a license, on the faith of which the defendants acted and expended money in the erection of the building and gate. But in the first place the evidence fails to show that the defendants were at all influenced in their actions by the conduct of the complainant. In the next place, if a license, it was by parol and without consideration and revocable. *Hetfield* v. *Central R. R. Co.*, *5 Dutch. 571*. The case of *Raritan Water Co.* v. *Veghte*, *6 C. E. Gr. 463*, is sought to be applied by defendant's counsel, but in that case the act complained of was a construction on the lands of the licensee which affected the lands of the licensor, and a positive consent in writing was given, which was acted on by the licensee in making the expenditure.

The complainant also claims that the defendants have no right to erect or maintain a gate at the point selected, on the ground

that their charter authorized them, on the completion of their road, to erect three gates, and that, having already established that number, their power in that regard is exhausted, and that they can neither increase the number or change the location. The authorities seem to bear out this contention. *Griffin* v. *House, 18 Johns. 397; People* v. *Collins, 19 Wend. 56* (at *p. 59*); *State* v. *Norwalk Turnpike Co., 10 Conn. 157, 163; Turnpike* v. *Hosmer, 12 Conn. 361; Morris and Essex R. R. Co.* v. *Central R. R. Co., 2 Vr. 205.* The gate, however, is but an obstruction to the highway—independent of the house, it does not appear to be erected on the complainant's land. The bill does not allege any special injury which it inflicts on the complainant which is not suffered by the public. There is no special damage he must necessarily be subjected to in consequence of his being an adjoining owner; tolls are demandable by the charter only per mile, and the gate interposes no obstruction to his passing from one part of his farm to another in that respect; as a structure on the highway, not authorized by law, it is a nuisance, but the rule is inflexible that complainant must show a special injury peculiar to himself and distinct from the general inconvenience experienced by the public to secure the aid of the court by injunction. *High Inj.* § *816; Attorney-General* v. *Utica Ins. Co., 2 Johns. Ch. 371* (at *p. 380); Van Wagenen* v. *Cooney, 18 Stew. Eq. 24; Zabriskie* v. *Railroad Co., 2 Beas. 314; Board of Health* v. *New York Horse Manure Co., 2 Dick. Ch. Rep. 1; Van Horne* v. *Newark Passenger Railway Co., 3 Dick. Ch. Rep. 332.*

It appears that the defendants have so constructed a drain that the water is thrown upon the lands of the complainant. This is an injury which this court will restrain. *Field* v. *West Orange, 9 Stew. Eq. 118; S. C., 10 Stew. Eq. 600; Miller* v. *Morristown, 2 Dick. Ch. Rep. 62.* The complainant is entitled to an injunction against the dwelling-house and maintenance of the drain, so far as it discharges the water on the complainant's land.